(No. 25902.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN J. RICKEY, Plaintiff in Error.

*Opinion filed February 14, 1941.*

SAMUEL A. HOFFMAN, and ARTHUR L. HOFFMAN, (JOHN R. MCSWEENEY, of counsel,) for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and MELVIN S. REMBE, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of the crime of rape and sentenced to five

years in the penitentiary. He brings the cause here contending that he was not proved guilty beyond a reasonable doubt and that the court erred in giving a certain instruction, and in passing upon the admissibility of evidence. The act of intercourse was admitted. The only question of fact involved was whether it occurred forcibly and against the will of the prosecutrix.

Plaintiff in error, thirty-two years of age, was employed as a taxicab driver. Prosecutrix was thirty-one years of age and on November 12, 1939, the date of the alleged crime, resided with her father and mother in the city of Chicago. At that time she was separated from her husband, though at the time of the trial they were living together. She testified that on the evening of November 12 she attended a picture show; that about 9:30 she took plaintiff in error's taxicab for her home on Winchester avenue; that on her telling him the way to her home he suggested that she lived in the neighborhood of the Lindbloom High School and said that he had gone to school there, and upon learning her name, stated that he knew her brothers at that school and that his sister attended school there also. She testified that they conversed about mutual friends they had known in the school, and that when they arrived at Sixty-first and Winchester he, instead of turning onto Winchester continued on past it. She told him that he should have turned there, but that he continued on past for a way and stopped the cab and told her he was separated from his wife and that he would like to get acquainted with her and have her trail his wife around at different taverns where she went, that he might get evidence to get the children away from her because his family wanted them. She testified that she told him if he did not start driving back she would get out and walk, whereupon he told her that they were going out and they would have to get better acquainted, and suggested that they go to a tavern and have a couple of drinks; that she refused and

told him to drive her home; that she made an attempt to get out of the cab but he kept on going and continued to suggest to her that they go out together; that he turned east and that they passed into a colored neighborhood and drove down a dark alley where he stopped in the middle thereof. She testified that she jumped out of the cab and he ran after her and caught and held her; that, after arguing with him to take her home, he said that if she would get back into the cab he would take her home, but when they were again in the cab he drove up the alley a couple more houses, into a more protected spot, and turned out the lights; that she jumped out of the other side of the cab and ran south but he caught and held her, at the same time continuing to argue with her. She testified there was a vacant lot in front of the place where the cab stopped and an automobile came through that lot; that plaintiff in error told her that it would do her no good to scream because the party in the car would think it was a holdup and she would be worse off; that he would knock her down and out and roll the cab over her so that no one would know what happened and she would not have a chance to tell it; that he started pushing her about and threw her against the garage; that she was terrified because he was so strong; that he bent back her wrists, and that she had become so frightened that she was hysterical. He suggested that she get back into the cab and that he would take her home; that she pleaded with him to let her walk out of the alley, promising that she would not make any report of the matter; that she tried numerous times to break away from him and that each time he seized her by the wrist and bent it back, or by the neck; that he finally told her to come on and he would take her home as she was no good to him the way she was, and demanded his cab fare, which she paid. She resisted getting back into the cab but he pushed her into it and got into the front seat where he took off his leather jacket; that he crawled

through the partition between the front and back seat and pinned her to the seat of the cab; that she started to scream and he began hitting her and telling her that the ring on his finger would mark her up so that no one would ever know her. He started choking her and overcame her resistance, committing the act charged.

She testified that thereafter he told her they should go to a hotel where there wouldn't be any trouble; that she agreed with the idea so that she might have an opportunity to get out of the cab and away at a stoplight; that he drove out of the alley and as they approached the stoplight, which was against them, she sat on the edge of the seat with her hand on the door handle, to jump out of the cab when he stopped, but he was watching her through the mirror and ran through the stoplight without stopping; that he drove to a tavern and said they would go in and have some drinks. Witness testified that she consented to go with him in the hope that she would have an opportunity to get away from him; that in going into the tavern he held her by the wrist so that she could not get away until they got inside; that there was a bartender in the tavern and a man asleep at one of the tables. A boy about nineteen years old was at the bar, who seemed to be on friendly terms with plaintiff in error; that the latter ordered a couple of drinks, ordering beer for her, which was put before her but which she did not drink; that he went out to the cab to get his coat to pay for the drinks, when she asked the bartender to use the telephone, but fearing that she would not have time to telephone before he returned she asked the boy at the bar to get her out of there and call a policeman or do something to get her out; that by that time plaintiff in error returned, the boy to whom she had spoken told plaintiff in error he wanted to talk to him about a matter and he succeeded finally in getting him to go to the end of the bar where she was out of his sight. She thereupon ran out of the tavern and down

the street where she found a policeman, and that after that she was in such a state the only thing she remembered was that when she got to the policeman she told him she wanted to go home; that the policeman and another gentleman brought her home; that she told her mother of her difficulty but did not tell her of the crime that was committed against her because her mother had been ill for some time and she did not want to worry her, but that early the next morning she told her father all about it.

The bartender at the tavern where plaintiff in error and complaining witness went after the alleged crime, testified to their coming into the tavern; that plaintiff in error ordered drinks; that the girl did not drink the beer served her but whispered to him that she wanted to get rid of plaintiff in error; that plaintiff in error walked to the back part of the room with a man named Mike, and the girl ran out.

Officer Keslinke testified that about 12:30 or 12:45 on the morning of November 13 he was standing on the southwest corner of Racine and Sixty-third street when he saw a woman running toward him; that she seized him by the arm. She came from the direction of the tavern; she was crying and said: "A man wants to kill me"; that he told her there was no one behind her and she said: "A man," and he looked around and there was nobody there. He told her to calm herself and tell him all about it; that she did not answer. She was crying and he asked her if she got out of a cab. He looked up the street a way and saw a cab going east, pulling away from the tavern. The cab had two men in it, one of them had no coat on. He testified that he took the number of the cab; that he took complaining witness into the tavern and was going to get a cab to take her home but she held onto his arm crying and begging him not to leave her; that a man named Crook came over and asked if he could help. He suggested that

he and the officer take her to her home in his car, which they did.

The evidence shows that the number of the cab which officer Keslinke wrote down on that occasion, was the one borne by the cab which plaintiff in error was driving at that time. He was later arrested.

Arthur Crook testified to having seen the officer and the complaining witness in the tavern. He did not, at the time, know the name of the complaining witness. He identified her in the court room. His further testimony was, in substance, as follows: Complaining witness came in with the officer whom he identified as witness Keslinke, and asked for a slug to telephone. He saw, at the time, that she had been crying; she was sobbing then; that when she came out of the telephone booth she sat down and was shaking and sobbing. The officer went outside looking for a cab and that the witness went to her and asked if there was anything he could do, telling her that he had his car and if the officer would go along he would take her home. Upon the officer's return they took her home in witness' car.

Complaining witness' father testified that she had made complaint to him early next morning; that he looked at her arms and neck; that she had been bruised on both sides of her neck, two bruises up under one ear and another large bruise on the lower part of the neck, and that there were several black marks on her arm outside and inside and another on her wrist, and that her wrist was quite swollen, He testified to what he did to secure the arrest of the defendant.

Plaintiff in error testified admitting the intercourse but denying it was had forcibly and against the will of complaining witness but with her consent. He testified, also, that after the conversation in the cab about the school, he suggested that they have a drink; that she consented and they went into a tavern at Damon and Fifty-ninth street

and had two drinks apiece; that they went into the tavern by a side entrance and sat in a rear room; that the bartender came in and took their order; that she ordered beer and he ordered whiskey; that they sat for some time and talked and had another drink, and that after that they left this tavern and sat in the car a while and spooned and she consented to intercourse and he drove into the alley described by the People's witnesses where he got into the back of the cab with her and they had intercourse with her consent. He further testified that they later stopped at the tavern described by the People's witnesses where she ordered beer and he ordered whiskey; that he went to the back of the bar to the lavatory and when he came out she was gone; that that was the last he saw of her. He testified the bartender at the inn at Fifty-ninth and Damon, where they first went, was a man by the name of Joseph Goldstein.

On rebuttal, Goldstein was placed on the witness stand and stated that he was the only one on duty at the tavern at Fifty-ninth and Damon on that night; that he was tending the bar; that he served all drinks that were served that night, and if plaintiff in error and a girl had been there and ordered drinks, he would have served them; that he saw plaintiff in error in the afternoon of November 14 but that he did not remember seeing him or anyone resembling the complaining witness on the night of November 12.

Plaintiff in error's counsel offered to show the measurements of the window between the front and back seat of the cab of the kind which plaintiff in error was driving on that night, for the purpose of showing that the window was not high enough to permit one of the size of plaintiff in error to crawl through it. Admission of this testimony was refused on the ground that the witness testified that he had not measured this particular cab. The court's refusal constitutes one of the errors here complained of. The witness testified that he was superintendent of an auto-

mobile repair shop where the Checker cabs and cars were serviced; that plaintiff in error was, on that night, driving a standard Checker cab; that the measurements of the partition window of standard Checker cabs was 10¼ inches high and 48 inches wide; but that he did not know the number of the cab plaintiff in error had driven. He testified that he had not measured this particular cab, and as there was no evidence tending to indicate that all standard cabs of that make had the same size window between the front and rear seats, or that the witness had any knowledge of the size of the window in this particular cab, it was not error to strike his testimony.

The court gave an instruction telling the jury that if, at the time of the alleged attack, complaining witness "was paralyzed by fear caused by threats and intimidation, she would not be expected to make resistance or outcry; and 'if the jury find that the superiority of defendant's strength over hers was very great, she might not be able to make effectual resistance, and if the place where the alleged act occurred was so remote from all human help that an outcry would not prove availing, none need have been made, as the law does not require the doing of impossible or useless acts."

Plaintiff in error cites, in support of his contention that the giving of this instruction was error requiring reversal, the case of *People* v. *Eccarius,* 305 Ill. 62, where the giving of a like instruction was held, under the evidence in that case, to require reversal of the judgment. This court, in that case, pointed out that there is no rule of law as to what particular acts will prove that carnal knowledge of a female was against her will. In order to prove that fact there must be evidence which will show that the act was committed by force and against her will, and if she has the use of her faculties and physical powers, the evidence must show such resistance as to demon-

strate that the act was against her will. In that case carnal knowledge was admitted but force was denied, and there was the evidence of disinterested witnesses describing the acts of the complaining witness which tended to corroborate the defense.

In the case before us the defense is one of consent and there is nothing in the record to corroborate the statement of plaintiff in error that consent was given. The rule of law as to what is necessary to be proved in the case of forcible rape, has been discussed by this and other courts in numerous cases. In *Bean* v. *People,* 124 Ill. 576, the jury was directed to "take into account all the surrounding circumstances, the acquaintanceship of the parties, the relative physical strength of the defendant and the complaining witness, the condition as to fear, or otherwise, in which complaining witness then was * * * as well as all other facts and circumstances proved on the trial." In approving that instruction this court pointed out that the instruction did not direct what weight was to be given those facts in determining the question of force or lack of it, but that they, and other facts and circumstances, should be taken into account in determining the question; that the instruction was essentially that the question whether the act was against the will of the prosecutrix was to be determined upon consideration of all the facts and circumstances proved on the trial.

In *Huston* v. *People,* 121 Ill. 497, the defense asked for an instruction telling the jury that unless it found from the evidence that the prosecutrix, at the time of the alleged assault, used all the force and resistance in her power to prevent the accomplishment of the act, it should find the defendant not guilty, or at least should take such fact into consideration in passing upon his guilt. The instruction was refused and this court approved the refusal on the ground that it did not negative the hypothesis that the

prosecutrix's failure to make the requisite resistance was caused by the threats and the intimidation of the accused, there being evidence tending to prove that hypothesis.

In *People* v. *Celmars*, 332 Ill. 113, an instruction similar to that objected to in this case was given. In that case the defense was that the defendant had never seen the prosecutrix and was not her assailant. It was held that since it was proper that the jury, in considering the evidence, take into consideration the matters stated in the instruction, they were proper as an argument before the jury but not for instructions by the court, citing the *Eccarius case*. In *State* v. *Urie*, 101 Iowa, 411, 70 N. W. 603, an instruction telling the jury that where threats of personal violence are made to overcome the will of the prosecutrix and she believes that her person is in danger from said threats, the law considers such carnal knowledge as having been forcibly had against the will of the prosecutrix. This instruction was approved.

In *Grace* v. *State*, 234 S. W. (Tex.) 541, where evidence of threats appeared in the record, a charge by the court that where the rape was accomplished by threats, the crime is proved, was held not error. In *State* v. *Long*, 72 Conn. 39, 43 Atl. 493, the jury was instructed that if the complaining witness was incapable of resistance through fear, or resistance was useless, there might be rape if no resistance was, in fact, made; that resistance would be expected unless the mind of the prosecutrix was so overcome by fear that she was incapable of resistance, or unless there was such exhibition of force as to make resistance useless or impossible. In that case there was evidence of the disparity and size and strength between the defendant and the complaining witness, and evidence of acts of brute force tending to establish the existence of fear. The instruction was approved.

In *Mills* v. *United States*, 164 U. S. 644, 41 L. ed. 584, it was held that where the complaining witness is over-

come by numbers or terrified by threats or placed in a position in which resistance would have been useless, proof of resistance to the extent of her ability becomes unnecessary, though, in the absence of such evidence, proof that she did resist to the extent of her ability at the time and under the circumstances, is necessary.

The instruction before us, when applied to the record in this case, though inartificially drawn and argumentative, does not constitute error requiring reversal. The elements of threat and intimidation were present in her testimony. In this she is corroborated by her condition as she appealed to the policeman, as that condition was detailed by him and by the witness Crook. The jury saw the two parties in the court room. The record shows the complaining witness was a young woman of slight stature. The jurors also were able to judge something of the strength of plaintiff in error by his appearance. They were told that if they found that the superiority of his strength over hers was very great, she might not be able to make effective resistance. Her testimony as to his treatment of her was sufficient to justify the jury in believing that his strength over hers was very great. There was much evidence that the place where the act occurred was remote from human help. As applied to this case, we are of the opinion that the instruction is not open to objection found to similar instructions considered in the cases above referred to. We do not see, in the instruction before us, any statement on the part of the court that the complaining witness was paralyzed by fear or that the strength of the defendant was so great over her strength that she might not make effectual resistance, nor was there a direction to the jury that the place where the act occurred was so remote from human help that an outcry would not prove availing. These matters were left for the jury to determine from the facts and circumstances shown in evidence, and as we have indicated, the evidence was sufficient to justify the jury's find-

ing in that regard. The *Eccarius case* is not authority for the claim made in argument here, that the court may not explain to the jury what facts, if proved, would excuse outcry or resistance to the full extent of the complaining witness' strength. Such are statements of the law of the case. There was evidence in the record in this case justifying the statement of such rules of law. In so far as the *Eccarius case* conflicts with the foregoing opinion it is not adhered to. As applied to this record, it was not error to give this instruction.

Complaining witness' testimony is substantially corroborated, as we have indicated, by circumstances shown in evidence and by the testimony of disinterested witnesses as to her condition after the alleged assault. Plaintiff in error's testimony is affected by the contradiction, both by complaining witness and the bartender Goldstein, of his statement that they went into a tavern at Damon and Fiftyninth street. This was an important matter of fact touching the question whether the relations prior to the alleged crime were such as to indicate consent, as was shown in the *Eccarius case*. This record is free from such error as would require reversal, and the judgment is affirmed.

*Judgment affirmed.*